Good morning. May it please the court. Counsel, my name is MJ Hayden. I'm an assistant federal defender. I'm here today representing Michael Lewis. Mr. Lewis asked that his case be remanded for resentencing because he believes that the judge erred in concluding that two sales that he was responsible for that contained L-methamphetamine were included as actual methamphetamine. Under the guidelines, Mr. Lewis pled guilty to a felony information charging him with three counts of selling small amounts of methamphetamine. Relevant conduct presented at the sentencing included three additional sales. The six sales, out of the six sales, all but two were D-methamphetamine, which had a calculated under guidelines using that 60%. One of the sales, the largest sale, consisting of approximately 3.5 grams, was actually L-methamphetamine. And the last sale contained a mixture of D and L, not to say that it was what's characterized as D-L-methamphetamine. It actually had both D and L in the drug equivalency tables. Counsel, haven't the distinctions between D and L been pretty much obliterated by Amendment 518, which is effective, I guess, in 2003? Well, Your Honor, I believe that Amendment 518 I'm just reading from it. This amendment deletes the distinction between D and L-methamphetamine in the drug equivalency tables and commentaries in 2D1.1. Yes, Your Honor. That amendment took effect actually in 1995. But it is Mr. Lewis's position that the distinction between D and L, if you include L as actual methamphetamine, that that is not rationally related to the sentencing goals. Are you making a, what is your argument? Is it constitutional? Is it statutory? Is it the guidelines themselves? What is it? Your Honor, I believe his argument that it's not rationally related to the sentencing goals would be a constitutional argument in that due process requires that there be a rational relation between characterizing something and giving it a harsher penalty to a sentencing. So you're really arguing that when they obliterated the distinction between L and D for purposes of sentencing, that there wasn't any rational basis for doing that because there are different substances? That's correct, Your Honor. And when you look at the history, and this may not be actually clearly stated in my brief, but when you look at the history of what was going on in 1995, and certainly the Court can look at all the 2255s that came before the Court during that time period, that lab reports and the analysis that the DEA was doing just didn't differentiate between D and L. So all these defendants were saying, I've got L. You can't sentence me for D. And so the Sentencing Commission looked at that and said, well, all this litigation, we don't want this. We're just going to characterize everything as meth. Well, here's what it says. L-meth, which is a rather weak form of meth, is rarely seen and not made intentionally, but rather results from a botched attempt to produce D-meth. So isn't that a rational explanation? Well, Your Honor, I think the rational explanation in punishing people who have a high purity of D-methamphetamine is because D-methamphetamine, because of the way that it interacts with a user, if you have a high purity level, then it can be diluted. And so therefore, a small amount can be distributed to a number of people, where that rationale really doesn't apply to L, because L has one-tenth the potency of D. But everybody in the transaction's acting like it's D, as it was supposed to be D. Well, and I think that's a little bit misleading. Why is that not unlike a situation where you've got a controlled sale, where they're selling something which everybody assumes the buyer's not going to get away with, because there are agents all around the house? You could say, well, gee, I couldn't possibly introduce this and cut it and sell it to 20 different people, because they were going to arrest me, so I shouldn't be punished. And we don't do it that way. Why should we do it that way? Just because L happened to be a weak form that nobody intended. Don't we act by what the parties were trying or intending to do, and in this case, every assumption. And indeed, in your client's particular case, the district court opened the door and said, okay, prove up that your guy was trying to sell L, and he had a buyer for L, and we'll treat this differently. And there was nothing. Let me answer that, and I have two responses. Number one, I don't think practically that buyers, and particularly people like Mr. Lewis, who was at the end of the food chain, so to speak, he was selling half grams, grams, very low amounts, and he was a user. I don't think that they necessarily call up the person that they're buying from and say, I want D methamphetamine. I don't want L. I want D, and I want it at a certain percentage. I just don't think that happens. Once he got it, if he had gotten away and been able to use it, he probably would have been a very unhappy customer. Once he discovered he had L, right? He probably was, and that probably led to the fact that the most significant sale and the six transactions that he did was the L methamphetamine, because perhaps he got it, he tried it, he didn't like it, he was going to get rid of it. You see, he thought it was D, he wanted it to be D, and everyone on the street is treating L and D the same, because L is a botched D, and if they happen to get L, they don't, nobody talks about it, so distributing it. So why should we now undo something that was done 15 years ago and say, no, we've got to look at the actual chemical, not what the people are, how the defendants are functionally treating this stuff. And let me answer that, because I think that the reason that the court should look at it now is that in the past 15 years, things have really changed. 15 years ago, according to all the 2255s that were filed, the government labs were not testing for D and L. Now they are. Now they're testing for purity. They weren't doing that 15 years ago, and when the Sentencing Commission made that change, I don't think that it anticipated where we are today, where the labs are testing for D and L, they're testing for DL. The reason given by the Sentencing Commission speaks to testing at all. It speaks to what the parties are intending. It hasn't changed. And your honor, let me address that issue, please, because had my expert been able to testify, my expert would say that based on all the controls that are in place today, that there are actually people who are intentionally manufacturing L, which was not the case 15 years ago when the change was made. And for fraud as well as for pushing drugs. Perhaps so, your honor. The last case. I would like to reserve some time. Yes, thank you. Good morning, your honors. Kim Sayers-Fay on behalf of the United States. It's our contention that the government's, or excuse me, that the district court's sentencing methodology in this case was both textbook and exemplary. The court, first of all, recognized that it had an obligation to correctly calculate the guidelines. It didn't have any, it had to follow Amendment 45. 518, which plainly the court is familiar with. And that amendment is simply not ambiguous. It says, I misplaced it. Under this amendment, L-methamphetamine would be treated the same as D-methamphetamine, i.e., as if an attempt to manufacture or distribute D-methamphetamine. So I don't think there's any ambiguity there that would lend itself to the rule of lenity. But the court, I think, was also very savvy in realizing that it could consider the L and D distinction under the rubric of 3553A. And as Judge Clifton pointed out, I think the judge did a terrific job of really flushing out the fact that there was no logical reason to do so in this particular case. The district court invited the defendant to put up some evidence that there's a market for L-methamphetamine, that he intended to service that market. And all the evidence was to the contrary. I would note that if one reads the PSR, you can note that there was no price discrimination among what he sold. It wasn't as if the day that he sold the 3.5 grams of L-methamphetamine, that he gave that at a bargain discount price, was all sold roughly at the same amount. There was no, and on the last sale, it was a little bit of L and a little bit of D, which, again, runs counter to the theory that he was, in fact, intending to sell something other than the real McCoy. So I think the district court was absolutely correct that it needed, in the first instance, to calculate the guideline based pursuant to Amendment 518, respecting the elimination of the different guideline for L-methamphetamine, and that there was no logical reason in this into account under 3553A. Okay. Is there anything more to that point that we need to know? I don't believe so, Your Honor. I don't believe so. And I would concur, in terms of any constitutional argument, certainly there is a rational basis for the distinction. One could distinguish between drugs based on their level of purity. That is rational. It is also rational to distinguish, as the Eighth Circuit did in the Lopez case, which we cited on page 11 of our brief, based on what did the person intend to distribute. I think that's perfectly rational. And that is what the Eighth Circuit did, and that's what the district court did in this case. The district court was also plainly within its, it was certainly its prerogative to conserve judicial resources and not listen to an expert opine on a chemical distinction that was irrelevant to its analysis. Before I say anything that may be irrelevant to your analysis, I think I'll take my leave. Let me first address the issue of whether the statuette is ambiguous. It's Mr. Lewis's contention that if the commission truly desired to treat D and L as the same, then why did it have the caveat that only D could be included to define what is characterized as ice? So, therefore, the commission is making a difference there. When you look at that, you have to go back and say, well, are they really saying that L-methamphetamine, this really innocuous substance, should be treated as pure? As far as Mr. Lewis's interest... I'm persuaded that it's innocuous. It has one-tenth the potency of... But that's hardly innocuous. The cases say innocuous. Oh, really? I think it's relative. And probably so. But it has one-tenth less potency than the D-methamphetamine. And the distinction between a mixture and actual is ten times. So why should it be treated as actual? And I think that the fact that the commission has distinguished that L is different in defining the definition of ice, that maybe they didn't consider everything and maybe it's ambiguous, and if it's ambiguous, then the rule of lenity would apply. As far as Mr... You're in the red. Yeah, I am. The intent, I don't know that... Everybody certainly intends to buy the most potent drug that they can buy, and we don't punish people for intending to buy like 100% pure methamphetamine when they get something less. Yeah, okay. Thank you. Thank you. The case just argued is submitted for decision.
judges: Schroeder, O'scannlain, Clifton